

FILED

2010 AUG 11 P 3: 5

U.S. DISTRICT COURT
NEW HAVEN, CT

```
----------------------------------X
                                  :
MILLER AUTOMOBILE CORP.,          :
D/B/A DARIEN AUTOMOTIVE GROUP     :
                                  :
         Plaintiff,               :      CIVIL NO. 8
                                  :
         v.                       :      3:09-CV-1291 (EBB)
                                  :
JAGUAR LAND ROVER                 :
NORTH AMERICA, L.L.C. and         :
FORD MOTOR COMPANY                :
                                  :
         Defendants.              :
                                  :
----------------------------------X
```

## RULING ON DEFENDANT FORD MOTOR COMPANY'S MOTION TO DISMISS

Defendant Ford Motor Company ("Ford"), previously the manufacturer and marketer of Jaguar automobiles, moves to dismiss the two counts of the First Amended Complaint ("Amended Complaint") filed against it by a Jaguar dealership, Miller Automotive Corporation, d/b/a Darien Automotive Group ("Darien" or "Miller").[1] Darien alleges: (a) a breach of the implied covenant of good faith and fair dealing (Count I) and (b) promissory estoppel (Count II). Both claims relate to an expensive expansion of Darien's Jaguar dealership to accommodate vehicle sales that never materialized after the rollout of a new Jaguar line by Ford.

---

[1] On February 5, 2010, Darien filed a Corrected First Amended Complaint, changing the name of the plaintiff from "Miller Automotive Corp." to "Miller Automobile Corp." Ford's pending motion to dismiss applies to the Corrected First Amended Complaint, referred to herein as the Amended Complaint.

For the following reasons, Ford's motion [Doc. #38] is GRANTED. Darien's claims against Ford are dismissed without prejudice. Leave to file a second amended complaint is GRANTED.

## FACTUAL BACKGROUND

For the purpose of this ruling on Ford's motion to dismiss, the Court accepts the following alleged facts taken from Darien's Amended Complaint and attached exhibits as true.

In 1989, Ford acquired Jaguar Cars, Inc., which was then the U.S. distributor of Jaguar vehicles. In 1993, Ford dissolved Jaguar Cars, Inc. and created a Jaguar Cars division through which it distributed Jaguar vehicles in the U.S. Ford ended its association with the Jaguar brand in 2008 when it sold it to Tata Motors. Tata Motors then formed Jaguar Land Rover North America, L.L.C. ("JLRNA"), which is now the U.S. distributor of Jaguar vehicles and franchisor of Jaguar dealerships.

After Ford acquired Jaguar Cars, Inc., it decided to move the Jaguar brand away from its traditional role as a high margin/low volume luxury brand that specialized in large, powerful sedans to a high volume luxury brand that offered modern entry level vehicles alongside its established models. To accomplish this brand transformation, Ford developed a new Jaguar model, the "X-Type," which was designed to compete with the entry-level offerings of BMW and Mercedes-Benz.

Ford told Jaguar dealers that the unveiling of the X-Type would alter Jaguar's image from a stodgy, old-fashioned brand to a modern alternative to German luxury imports. Ford predicted that the X-Type would make Jaguar a mainstream, high-volume product, and that the offering of an entry level luxury vehicle would give it a much bigger pool of potential customers as well as create brand loyalty with a younger generation that was not traditionally drawn to Jaguar. To accommodate this expanded product line, Ford required Jaguar dealers to expand or construct larger facilities under the "X400 Facility Initiative."

Darien has been a franchised Jaguar dealer for 27 years. In mid-2000, Jaguar Cars advised Darien that the X400 Facility Initiative required Darien to upgrade, expand and renovate its dealership facility to prepare for the anticipated buyers of X-Type vehicles.

As part of the X400 Facility Initiative, Ford required dealers to have an exclusive Jaguar showroom, dramatically increase total space and capacity, install new signage and luxury furnishings and alter the aesthetics of the dealerships. Ford initially predicted that Darien's anticipated "planning volume" after the X-Type's release would be 1123 vehicles.[2] To

---

[2] "Planning volume" is an industry term based on the manufacturer's proprietary studies of the dealer's market, identifying, among other things,

accommodate this predicted increase in sales, Ford required Darien to, among other things, increase its showroom by 3,000 square feet. Ford set the required increase in square footage for each department within the dealership based on the expected increased planning volume.

Darien questioned Ford's predicted increase in planning volume due, in part, to the expected cost to Darien of a renovation of the dealership facility, especially considering that an earlier expansion did not yield the sales that Jaguar Cars, Inc. had anticipated. However, Ford repeatedly assured Darien that Ford's studies showed that the new X-Type would generate substantially increased sales and service opportunities for Jaguar dealers.

Ford used promises of exponential sales growth to entice dealers to expand their facilities, but enforced the expansion requirements through the retention of incentive funds. Historically, Jaguar sold vehicles to dealers at a specified cost and set a manufacturer's suggested retail price ("MSRP") for each vehicle. The difference between the dealer cost and the MSRP provided the dealer's profit margin. However, to persuade dealers to participate in the renovation/expansion plan, Ford increased the dealer cost by approximately 6%, but left the MSRP the same, thereby reducing dealer profit by 6%.

the number of vehicles the manufacturer expects the dealer to sell in a given year.

4

Out of that 6%, every dealer received 2% back, but only those dealers participating in dealership renovations received the remaining 4% back, based on performance and completion criteria. Non-participating dealers therefore experienced a net cost 4% higher than other Jaguar dealers. The substantial 4% cost differential amounted to approximately $2,100 per vehicle that Darien sold over a four year period. This cost difference was a strong inducement for dealers to participate in the campaign, lest their competitors be able to offer the same vehicles at lower prices.[3]

Based upon Ford's representations and assurances, Darien committed to meeting the requirements of the X400 Facility Initiative.

The X400 Facility Initiative imposed very specific guidelines relating to every aspect of the renovation including square footage, number of service bays, signage, dedicated space for customer waiting area, lavish décor and the interior design. The process to decide upon these guidelines was lengthy. Ford required Darien to: (a) submit plans to Ford for approval before construction could commence; (b) acquire an adjacent piece of property in order to comply with Ford's Jaguar parking space requirements; and (c) obtain several zoning changes to expand

---

[3] The Connecticut legislature prohibited this sort of activity by a distributor on May 8, 2009. Conn. Gen. Stat. § 42-133cc(19)-(20).

the facility, build the parking area and install Ford mandated Jaguar signage.

After Ford approved Darien's plans, Ford required Darien to enter into a Performance Agreement detailing Darien's duties during the renovation, time schedules for completion and specifying the reasons for the renovation.[4] Darien conveyed concerns regarding the terms of the Performance Agreement, but Ford insisted on the execution of the standardized Performance Agreement without alteration. Darien executed the Performance Agreement on November 22, 2002 and Jaguar Cars executed the agreement on December 5, 2002.

The Performance Agreement identified the site and facility requirements, specifying that the space allocated to Jaguar must "meet or exceed Jaguar's requirements for a dealership with a Jaguar planning volume of 962 units." Darien again questioned Ford about the necessity of the facility expansion, having engaged in a similar project only ten years prior, but Ford

---

[4] The Performance Agreement served as a de facto addendum to the provisions of the Dealer Agreement between Jaguar Cars and Darien dated July 11, 1990. The Dealer Agreement incorporated by reference the "Dealer Agreement Standard Provisions" ("Standard Provisions"). Article 4.3 of the Standard Provisions expressly contemplated that the parties would enter into the Performance Agreement. Additionally, the Standard Provisions also gave Ford control over the marketing, offerings for sale and design of Jaguar products. Thus, Article 7.6 provided that the "Manufacturer shall have the right, at any time and from time to time, to make changes in the design or specification of Jaguar Products [i.e., Jaguar vehicles or parts]" and that it had no obligation to compensate dealers in the event of such changes. Article 18.7 of the Standard Provisions stated that "[n]othing in this Agreement shall give Dealer the right to continue to be supplied by the Company with the Jaguar Vehicle line or any particular Jaguar Vehicle models, which may at any time be withdrawn or suspended . . . ."

replied that the expansion was necessary for the sales growth
sure to follow.  The Performance Agreement set forth Darien's
obligations to carry out the renovations that Ford approved and
that "Jaguar will not be liable to [Darien] for any such
expenses."  The Performance Agreement also stated in paragraph
23 that Darien made an independent decision to follow through
with an upgrade to its facilities based on its own assessment of
its benefits:

> You [Darien] represent and warrant to Jaguar
> that you have independently reviewed any
> projected financial commitments and
> potential for profits or losses that may
> result from entering into this Agreement,
> and that you are in a superior position as
> compared to Jaguar to know and understand
> your potential for such profit and/or loss.
> You have not relied on any statements by
> Jaguar or its representatives with respect
> to any potential for such profit or loss,
> now or in the future that may result from
> your becoming an authorized Jaguar dealer. .
> . . You have entered into this Agreement
> voluntarily and without coercion, threats or
> intimidation of any kind whether from
> Jaguar, its officers or employees or
> otherwise.

Darien contends that after a buzz when the X-Type debuted
in late 2001, sales fell off sharply in 2003, down more than 40%
and well below the levels Ford predicted.  Darien further claims
that analysts stated early in 2003 that no markets had yet or
would sustain the sales Ford had predicted and that quality

issues that plagued Jaguar previously were also present with the X-Type.

Darien began renovations of the Jaguar facility in 2003 and completed them in 2005 at a total cost of $1,782,729.21.

After Darien completed the new facility, the sales increases Ford predicted never materialized. Instead, sales declined. Ford reduced the planning volume for Darien from the 962 required in the Performance Agreement to 50.

In August 2006, Darien advised Ford of the impact on Darien of Ford's decisions, and pleaded with Ford for help. Ford provided no aid. Darien then commenced this action.

On August 27, 2009, Darien served a complaint on JLRNA, asserting six claims for relief. JLRNA moved to dismiss that complaint on October 23, 2009, arguing that Darien's claims were brought against the wrong party, time-barred and failed to state any viable legal claim. Instead of opposing JLRNA's motion, Darien filed an amended complaint on November 11, 2009, naming Ford as a co-defendant. Ford was served on December 16, 2009. Ford's motion to dismiss was filed on February 4, 2010.

## LEGAL STANDARD

The function of a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure "is merely to assess the legal feasibility of the complaint, not to assay the weight of evidence that might be offered in support thereof."

<u>Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.</u>,
748 F.2d 774, 779 (2d Cir. 1984) (quoting <u>Geisler v. Petrocelli</u>,
616 F.2d 636, 639 (2d Cir. 1980)).  Therefore, when considering
a motion to dismiss, the Court must accept the facts alleged in
the complaint as true, draw inferences in the light most
favorable to the plaintiff and construe the complaint liberally.
<u>Gregory v. Daly</u>, 243 F.3d 687, 691 (2d Cir. 2001).  In ruling on
a motion to dismiss, the Court may consider only "the facts as
asserted within the four corners of the complaint, the documents
attached to the complaint as exhibits, and any documents
incorporated in the complaint by reference."  <u>McCarthy v. Dun &</u>
<u>Bradstreet Corp.</u>, 482 F.3d 184, 191 (2d Cir. 2007).

"To survive a motion to dismiss, a complaint must contain
sufficient factual matter, accepted as true, to 'state a claim
to relief that is plausible on its face.'"  <u>Ashcroft v. Iqbal</u>,
129 S. Ct. 1937, 1949 (2009) (quoting <u>Bell Atl. Corp. v.</u>
<u>Twombly</u>, 550 U.S. 544, 570 (2007)).  Although detailed
allegations are not required, a claim will be found facially
plausible only if "the plaintiff pleads factual content that
allows the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged."  <u>Iqbal</u>, 129 S.
Ct. at 1949.  Conclusory allegations are not sufficient.  <u>Id</u>. at
1949-50.

## DISCUSSION

### I.  Breach of the Implied Covenant of Good Faith and Fair Dealing (Count I)

Darien's first claim is that it failed to receive any of the predicted long-term benefits anticipated by the expansion required by the Performance Agreement because Ford failed to manufacture, market, advertise and follow through on its business plan relating to the X-Type.  Darien further alleges that Ford failed to properly consider the economic impact of the upgrade program on Darien as promised in the Dealer Agreement. Finally, Darien claims that Ford failed to properly anticipate a partial or complete failure of its product plans in its study of the market potential for the X-Type and the impact of that failure on Darien's ability to obtain a return on its facility investment.  The result of these alleged actions and failures by Ford was that Darien spent $1.7 million renovating the dealership, but did not experience increased vehicle sales. Darien alleges that these actions contravened the implied covenant of good faith and fair dealing implicit in the Dealer Agreement and the Performance Agreement.

Ford contends that Darien cannot state a viable claim for breach of the implied covenant of good faith and fair dealing for several reasons.  First, Ford argues that Count I is time-barred.  Second, Ford claims that the claim must fail because it

is not tied to any specific contract term.  Third, Ford argues

that Darien failed to plead any viable implied duty claim

because Darien failed to sufficiently allege that Ford acted in

bad faith.  Ford's second two arguments are correct and the

claim must therefore be dismissed.

### A.   Darien's Claim for a Breach of the Implied Covenant of Good Faith and Fair Dealing is Not Time-Barred

#### 1.   No Statute of Limitations Bars This Claim

Ford contends that the statute of limitations on a claim

for breach of the implied covenant of good faith and fair

dealing is three years.  This is incorrect.  As Darien asserts,

the statute of limitations period is six years.

The Connecticut Supreme Court stated in Collins v. Anthem

Health Plans, Inc., 275 Conn. 309 (2005), that a claim brought

pursuant to a contract, alleging a breach of the implied

covenant of good faith and fair dealing, sounds in contract law.

Id. at 333-34.  Such a claim is therefore subject to the six

year statute of limitations provided by statute.  Bellemare v.

Wachovia Mortg. Corp., 94 Conn. App. 593, 610 (Conn. App. Ct.

2006); see Independence Ins. Serv. Corp. v. Hartford Life Ins.

Co., 472 F. Supp. 2d 183, 189 (D. Conn. 2007) (analyzing the

same Connecticut precedents and reaching the same conclusion).

## 2. Darien's Claim Accrued After the Execution of the Performance Agreement

Ford claims that the clock on the statute of limitations started running prior to the execution of the Performance Agreement in December 2002, during the negotiations of that contract, and that Darien's claim is time-barred even under a six year limitation period because Darien did not commence this action until 2009. Darien claims that the accrual date is when Darien completed its renovations in 2005 when, it claims, Ford failed to provide the support and vehicles anticipated, and not during the negotiations of the Performance Agreement.

It is clear from the Amended Complaint that Darien complained about "Ford's failure to build a quality vehicle, properly market and advertise its product, follow through on its business plan and support Miller . . . ." (Amended Complaint at ¶56). All of these alleged failures occurred in the years following the execution of the Performance Agreement. Darien further alleged that "Ford had a duty to not interfere with or injure Miller's right to receive the benefit of the Dealer Agreement and Performance Agreement." (Amended Complaint at ¶58). This alleged right to receive the benefit of the Performance Agreement would also necessarily occur after it was executed. Finally, Darien complains that "Ford's reversal of course shortly after Miller completed the required renovation .

. . frustrated any opportunity Miller had to experience any of the 'long-term benefits' under the Performance Agreement and instead saddled Miller with only the 'costs' of the [X400] Facility Initiative." (Amended Complaint at ¶59). This alleged failure of Ford also occurred after execution of the Performance Agreement.

Because all of the acts and omissions complained about by Darien occurred after the Performance Agreement was executed and within six years of when Darien commenced this action, Darien's claim is not time-barred. This conclusion is supported by clear Connecticut precedent which states that "every contract imposes upon each party a duty of good faith and fair dealing in *its performance and its enforcement*." Collins, 275 Conn. at 333-34 (quoting Warner v. Konover, 210 Conn. 150, 154 (1989)) (emphasis added). Performance and enforcement of a contract occur *after* a contract is executed.

B. Darien Fails to Allege A Breach of A Discretionary Contract Term

"The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term." De La Concha of Hartford, Inc. v. Aetna Life Ins. Co., 269 Conn. 424, 433 (2005) (internal quotations omitted). Ford's second

allegation is that Darien's claim is insufficiently tied to a specific contract term to be viable. Darien contends that while the claim must emanate from a contract, it need not arise from a specific contractual term.

Turning to Darien's specific allegations, the dealership argues that its claim implicates both Article 4.3 of the Standard Provisions and Paragraph 2 of the Performance Agreement. Darien alleges that those provisions work in concert, in that Article 4.3 requires a Performance Agreement that balances the parties' interests and Paragraph 2 implements the agreement.

These provisions outline that a Performance Agreement will be considered by the parties and that a dealership expansion was to be contemplated. They do not, even taken as a whole, relate to the "discretionary application or interpretation of a contract term." Indeed, the execution of the Performance Agreement itself appears to be the natural result of those provisions and Darien's complaint relates to events following that execution (which is why the claim is not time-barred, as discussed above, *supra*).[5] Put another way, as discussed above,

---

[5] While Darien is certainly within its rights to plead alternative theories of relief, it cannot plead contradictory theories within the same claim. If Ford acted in bad faith negotiating the Performance Agreement—which was the contract contemplated by Article 4.3 of the Standard Provisions—then the claim *is* time-barred under the six year statute of limitations. If Ford's alleged bad faith occurred in the performance or execution of the Performance Agreement, Article 4.3—which only contemplates that a Performance Agreement will be negotiated and executed—is irrelevant.

*supra*, Darien alleges failures and improper actions by Ford *after* the execution of the Performance Agreement. To sustain a claim for a breach of the implied covenant of good faith and fair dealing, Darien must assert a claim more closely tied to a "discretionary application or interpretation of a contract term" as required by Connecticut law, and specifically of some term relating to Ford's requirements after the execution of the Performance Agreement.

C. Darien Fails to Adequately Plead Bad Faith by Ford

Ford argues that Darien's claim for breach of the implied covenant of good faith and fair dealing should be dismissed because Darien has not sufficiently alleged the required element of bad faith. Ford is correct.

"A duty of good faith and fair dealing is implied in every contractual relationship and it requires that neither party do anything to injure the other's right to receive the benefits of the contract." Landry v. Spitz, 102 Conn. App. 34, 46 (Conn. App. Ct. 2007). "To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." De La Concha of Hartford, Inc., 269 Conn. at 433 (internal quotations omitted).

The Connecticut Supreme Court has defined "bad faith" in this context as follows:

> Bad faith is defined as the opposite of good faith, generally implying a design to mislead or to deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation not prompted by an honest mistake as to one's rights or duties . . . . *[B]ad faith is not simply bad judgment or negligence*, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity . . . it contemplates a state of mind affirmatively operating with furtive design or ill will.

Buckman v. People Express, Inc., 205 Conn. 166, 171 (1987). (emphasis added; quotations omitted); accord Chapman v. Norfolk & Dedham Mut. Fire Ins. Co., 39 Conn. App. 306, 320 (Conn. App. Ct. 1995). "A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." Elm Street Builders, Inc. v. Enterprise Park Condominium Ass'n, Inc., 63 Conn. App. 657, 667 (2001) (citations omitted). "Whether a party has acted in bad faith is a question of fact . . . ." Renaissance Mgmt. Co., Inc. v. Conn. Hous. Fin. Auth., 281 Conn. 227, 240 (2007).

Here, Darien alleged that Ford entered into an agreement with Darien whereby Darien would expend substantial capital in order to construct a facility to Ford's specifications and, in turn, receive long-term benefits associated with Ford's plans for the Jaguar brand. Darien claims that because Ford, in its sole discretion, drastically altered its plans after Darien had completed its facility construction, Ford acted in bad faith. But that conclusion does not follow. Those allegations—that Darien renovated its facility because of Ford's intentions and that Ford then changed its plans—are not an allegation that Ford acted in bad faith. Indeed, there are no allegations in the Amended Complaint at all that Ford acted with "dishonest purpose or moral obliquity." Absent any allegations to the contrary, altering business plans—especially when the right to do so is reserved by contract to the party who alters them—is not an action done in bad faith, even if it occurs to the detriment of another. More facts need to be pleaded to allege even an "evasion of the spirit of the bargain."

Consequently, though the question as to whether a party acted in bad faith is a question of fact, to survive a motion to dismiss under Iqbal, a complaint must contain more concrete allegations of bad faith than are contained within Darien's Amended Complaint and the absence of such allegations requires the claim's dismissal.

## II.  Darien's Promissory Estoppel Claim is Precluded by Valid

## Contracts (Count II)

Ford argues that Darien's claim of promissory estoppel is precluded by a valid contract between the parties.  Darien argues (a) that its promissory estoppel claim is proffered in the alternative and not based on the agreements underlying its claim for a breach of the implied covenant of good faith and fair dealing, (b) that the Performance Agreement was an adhesion contract, and (c) that the Performance Agreement is unenforceable.  This claim must be dismissed.

Defining promissory estoppel and citing E. Farnsworth on Contracts, the Connecticut Supreme Court has held that

> [u]nder the law of contract, a promise is
> generally not enforceable unless it is
> supported by consideration. . . . This court
> has recognized, however, the "development of
> liability in contract for action induced by
> reliance upon a promise, despite the absence
> of common-law consideration normally
> required to bind a promisor . . ."

D'Ulisse-Cupo v. Bd. of Dirs. of Notre Dame High Sch., 202 Conn. 206, 213 (1987).  Quoting Section 90 of the Restatement Second, the Court noted that

> under the doctrine of promissory estoppel
> "[a] promise which the promisor should
> reasonably expect to induce action or
> forbearance on the part of the promisee or a
> third person and which does induce such
> action or forbearance is binding if
> injustice can be avoided only by enforcement
> of the promise."  A fundamental element of

> promissory estoppel, therefore, is the
> existence of a clear and definite promise
> which a promisor could reasonably have
> expected to induce reliance.  Thus, a
> promisor is not liable to a promisee who has
> relied on a promise if, judged by an
> objective standard, he had no reason to
> expect any reliance at all.

Id.

The doctrine of promissory estoppel can, therefore, sometimes provide a remedy where the underlying agreement is unenforceable.  "An action for promissory estoppel generally lies when there is no written contract, or the contract cannot be enforced for one reason or another.  Thus, it is an action outside the contract.  When an enforceable contract does exist, the parties cannot assert a claim for promissory estoppel based on alleged promises that contradict the written contract."  Lark v. Post Newsweek Stations Conn., NO. CV94 070 53 26, 1995 Conn. Super. LEXIS 2332, at *7-8 (Conn. Super. Ct. Aug. 9, 1995).

Darien's first argument is that its promissory estoppel claim is pleaded in the alternative to its claim for the breach of the implied covenant of good faith and fair dealing.  This is true, and a party may certainly plead alternative causes of action.  However, Darien incorporated into its promissory estoppel claim a statement that Ford and Darien were parties to the Performance Agreement which "specifies the duties relating to and arising from Miller's facility renovation."  This alone

renders this claim invalid because it shows that there was an enforceable contract between the parties. Connecticut courts presented with the same situation have held that incorporating paragraphs describing an enforceable contract renders a promissory estoppel claim invalid. See Reynolds, Pearson & Company, LLC v. Miglietta, CV000801247, 2001 Conn. Super. LEXIS 952, at *7 (Conn. Super. Ct. Mar. 27, 2001).

However, Darien's adhesion contract argument fails as well. "The most salient feature [of adhesion contracts] is that they are not subject to the normal bargaining processes of ordinary contracts," and they tend to involve "standard form contract[s] prepared by one party, to be signed by the party in a weaker position, [usually] a consumer, who has little choice about the terms . . . ." Hanks v. Powder Ridge Rest. Corp., 276 Conn. 314, 333 (2005) (internal quotations omitted). Though it is a question of fact regarding the relative strength of Ford and Darien in negotiating the Performance Agreement, Darien has not alleged that the power disparity is similar to that of a consumer compared to a company (or the common adhesion contract scenario of an insurer and an insured). Darien's claim that the contract was one of adhesion stems from the fact that if it did not sign the agreement, it would have been at a competitive disadvantage vis-à-vis other Jaguar dealers. This suggests an unequal bargaining position, but not one void as a matter of

public policy—especially where Darien signed a document stating that it entered into the contract voluntarily with awareness of the financial risks inherent in the agreement. The Second Circuit has stated, in the context of New York law, that "[i]t [the concept of adhesion] may not be invoked to trump the clear language of the agreement unless there is a disturbing showing of unfairness, undue oppression, or unconscionability." Klos v. Polskie Linie Lotnicze, 133 F.3d 164, 169 (2d Cir. 1997). There is no such showing in this case. Finally, were Darien correct in its argument that the Performance Agreement was an adhesion contract, it is fair to say that perhaps every contract between a car dealership and an automotive company would be a contract of adhesion. Darien has proffered no precedent in support of such a sweeping determination that would upend the relationship between these types of entities.[6]

---

[6] When Judge Underhill of this Court considered Connecticut law on adhesion contracts last year in Empire Fire & Marine Ins. Co. v. Lang, 655 F. Supp. 2d 150 (D. Conn. 2009), he determined that

> [t]he only contracts of adhesion the Connecticut Supreme Court has invalidated are contracts that seek "release of liability for future negligence" by a service provider, i.e., exculpatory releases required prior to participation in sporting events. See, e.g., Brown v. Soh, 280 Conn. 494 (2006) (car racing and employment context); Reardon v. Windswept Farm, LLC, 280 Conn. 153 (2006) (recreational horseback riding); Hanks v. Powder Ridge Rest. Corp., 276 Conn. 314 (2005) (recreational snowtubing). In the context of a rental car contract, the Connecticut Supreme Court side-stepped an analysis of whether the contract was one of adhesion and reached a result for the plaintiff car-renter on statutory grounds, under the Connecticut Unfair Trade Practices Act. Votto v. Am. Car Rental, Inc., 273 Conn. 478, 480 (2005).

Finally, even if the Court were to hold that the Performance Agreement was an adhesion contract, that "does not lead inextricably to its invalidation . . . ." Empire Fire & Marine Ins. Co., 655 F. Supp. 2d at 161. "Rather, the court must ask whether the disproportionate bargaining power of the parties necessarily results in contractual terms that contravene public policy or are otherwise unconscionable or void." Id. Here, the Court has been presented with no evidence that the disproportionate bargaining power of Darien and Ford renders the terms of the Performance Agreement unconscionable—an allegation that Darien does not even attempt to make.

**ORDER**

For the foregoing reasons, Ford's motion to dismiss [Doc. #38] is GRANTED. Darien's claims against Ford are dismissed without prejudice. Leave to file a second amended complaint is GRANTED.


SO ORDERED

/s/ Ellen Bree Burns, SUSDJ
ELLEN BREE BURNS
SENIOR U.S. DISTRICT JUDGE

Dated at New Haven, Connecticut this __11 day of August, 2010.

---

Id. at 160. A contract between an automobile dealership and an automobile manufacturer bears no resemblance to the aforementioned situations.