```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF CONNECTICUT

----------------------------------X
                                  :
MILLER AUTOMOBILE CORP.,          :
D/B/A DARIEN AUTOMOTIVE GROUP     :
                                  :
         Plaintiff,               :      CIVIL NO.
                                  :
             v.                   :      3:09-CV-1291 (EBB)
                                  :
JAGUAR LAND ROVER                 :
NORTH AMERICA, L.L.C.             :
                                  :
         Defendant.               :
                                  :
----------------------------------X
```

**RULING ON DEFENDANT JAGUAR LAND ROVER NORTH AMERICA, L.L.C.'S**

**MOTION TO DISMISS**

Defendant Jaguar Land Rover North America, L.L.C. ("JLRNA"), the manufacturer and marketer of Jaguar and Land Rover automobiles since 2008, moves to dismiss two counts of the First Amended Complaint ("Amended Complaint") filed against it by a Jaguar dealership, Miller Automobile Corporation, d/b/a Darien Automotive Group ("Darien").[1]  Darien alleges, *inter alia*, (a) a breach of the implied covenant of good faith and fair dealing (Count IV) and (b) a violation of Connecticut General Statutes § 42-133cc(18) (Count V).  Both claims relate to a

---

[1] On February 5, 2010, Darien filed a Corrected First Amended Complaint, changing the name of the plaintiff from "Miller Automotive Corp." to "Miller Automobile Corp."  JLRNA's pending motion to dismiss applies to the Corrected First Amended Complaint, referred to herein as the Amended Complaint.

1

request by Darien to relocate its Jaguar dealership and JLRNA's response thereto.

For the following reasons, JLRNA's motion [Doc. #31] is GRANTED. Leave to file a second amended complaint is GRANTED.

## FACTUAL BACKGROUND

For the purpose of this ruling on JLRNA's motion to dismiss, the Court accepts the following alleged facts taken from Darien's Amended Complaint and attached exhibits as true.

In 1989, Ford Motor Company ("Ford") acquired Jaguar Cars, Inc., which was then the U.S. distributor of Jaguar vehicles. After Ford acquired Jaguar Cars, Inc., it decided to move the Jaguar brand away from its traditional role as a high margin/low volume luxury brand that specialized in large, powerful sedans to a high volume luxury brand that offered modern entry level vehicles alongside its established models. To accomplish this brand transformation, Ford developed a new Jaguar model, the "X-Type," which was designed to compete with the entry-level offerings of BMW and Mercedes-Benz.

Ford and Darien entered into an agreement by which Darien would expand its Jaguar dealership to accommodate increased sales of Jaguar vehicles. At the completion of the renovation and expansion, sales of the X-Type did not meet expectations.

As a result of the X-Type's failure to generate the predicted sales and Jaguar's continued lagging sales, Darien was

2

left with a facility 15 to 20 times larger than what the market supported. The cost to maintain and operate a facility of that size outpaced the revenue generated by Jaguar sales. Consequently, Darien concluded that it could not afford to support the facility solely by operating its Jaguar franchise there.

To add revenue, Darien obtained another franchise—Nissan—and located it at the Jaguar facility. In order to stay in business, however, Darien concluded that it must also relocate its Jaguar operations to a smaller facility more suited to Jaguar's sales volume.

In 2008, Ford sold the Jaguar and Land Rover brands to Tata Motors ("Tata"). Tata consolidated the operations of both linemakes under a newly formed entity, JLRNA. JLRNA required Jaguar dealers, like Darien, to execute Replacement Dealer Agreements, which simply replaced any reference to "Jaguar Cars" or "Jaguar" with "Jaguar Land Rover North America, LLC," while adopting the Jaguar Standard Provisions and the Performance Agreement initially imposed by Ford. In or about May 2008, Darien entered into the Replacement Dealer Agreement with JLRNA. According to Darien, despite the formal name change, the executive management and day to day operations of Jaguar in the United States has been virtually unchanged since Tata purchased the linemake.

The Standard Provisions provided that dealership facilities had to maintain a certain design and décor to reflect the appropriate presentation of the Jaguar linemake.  In Section 4.4, they also provided conditions for a dealer to relocate a dealership.  Specifically, JLRNA agreed to approve proposed relocations "only if, based upon all the relevant factors, [JLRNA] in the exercise of its good faith business judgment considers the proposed relocation to be in the best interest of Dealer and of Jaguar owners in the area in which Dealer is located."

For several years, Ford, and, more recently, JLRNA, encouraged dealers who owned both Jaguar and Land Rover franchises to combine the linemakes in a shared facility. Darien owns and operates a Land Rover dealership located a short distance from its Jaguar facility.  As a dealer for both linemakes, Darien knew JLRNA's affinity to house Jaguar and Land Rover in a shared facility.

In 2009, Darien formally requested permission from JLRNA to relocate its Jaguar store into its Land Rover facility to address the costs of its oversized Jaguar dealership. Initially, JLRNA granted Darien conditional approval to relocate its Jaguar store subject to Darien executing a Performance Agreement.  The Performance Agreement mandated by JLRNA closely

resembled the Performance Agreement Ford required from Darien when it constructed its current Jaguar facility a few years ago.

The relocation Performance Agreement, and its related facility requirements, necessitated extensive facility renovations. JLRNA insisted on massive structural changes, including adding an extremely costly outside portico, installing a customized roof/ceiling on the Jaguar portion of the facility and calling for an increase in the actual footprint of the building in order to increase service capacity. JLRNA also required additional signage at the front of the property and mandated that Darien outfit the interior of the facility in accordance with JLRNA's long list of accoutrements. The cost of the facility construction, renovation, alteration and furnishing would exceed $1.5 million, not including, among other things, business lost due to the limited access to the facility the construction would cause.

Darien's current sales volume of approximately fifty new Jaguar vehicles per year generates approximately $258,000 in gross revenue which, coupled with added parts and service revenue, is insufficient to service the debt needed to engage in the renovations required by JLRNA.

Darien conveyed its concerns about the facility renovation cost to JLRNA and explained its reluctance to enter into a Performance Agreement in light of its prior experience with a

5

Performance Agreement and facility expansion.  In addition to the cost, Darien questioned the need to expand the facility in the first place because it was built to accommodate a planning volume of 550 new and 275 used vehicles (825 total) and the current combined planning volumes of Darien's Jaguar and Land Rover operations are 400 new and 200 used vehicles (600 total).[2] JLRNA rebuffed Darien's queries and did not alter its demand that Darien execute a new Performance Agreement requiring a facility renovation as a condition for the dealership relocation.

Darien declined to enter into the Performance Agreement and JLRNA rescinded its conditional relocation approval.

Thereafter, Darien renewed its request to relocate its Jaguar store to its Land Rover facility.  Throughout the summer of 2009, Darien corresponded with JLRNA, providing the address of the proposed new location and a site plan of the proposed facility, thereby attempting to demonstrate to JLRNA that a costly facility expansion was unnecessary given the current economic environment.  JLRNA continued to deny Darien's requests and each denial reflected JLRNA's steadfast insistence on costly structural changes.

---

[2] "Planning volume" is an industry term based on the manufacturer's proprietary studies of the dealer's market, identifying, among other things, the number of vehicles the manufacturer expects the dealer to sell in a given year.

6

On September 28, 2009, Darien again renewed its request to JLRNA to relocate its Jaguar store, this time offering to perform many of the modifications JLRNA sought to impose via the Performance Agreement, e.g., signage changes and interior refit with Jaguar graphics and heritage elements set forth in the facility enhancement guidelines, and offered to comply with JLRNA's extensive structural requirements, contingent upon a triggering mechanism, like a certain sales volume. Darien believed that this proposal provided JLRNA with assurances that Darien would undertake the facility renovations, while ensuring that the facility renovations would be supported by an adequate sales volume that would render the renovations financially feasible. Darien and Land Rover had entered into a similar arrangement in 2005 addressing Land Rover's suggestion that Darien's facility needed an expanded parts and service space.

On October 15, 2009, JLRNA rejected this request, stating that it could not agree to a threshold triggering event.

Darien alleges that JLRNA's rejections of Darien's relocation requests were unreasonable because, *inter alia*, the existing facility has adequate capacity for the relocation and the cost associated with the required renovation would not be addressed by expected sales volume.

On August 27, 2009, Darien served a complaint on JLRNA, asserting six claims for relief. JLRNA moved to dismiss that

7

complaint on October 23, 2009, arguing that Darien's claims were brought against the wrong party, time-barred and failed to state any viable legal claim.  Instead of opposing JLRNA's motion, Darien filed an amended complaint on November 11, 2009, naming Ford as a co-defendant.  JLRNA filed the instant motion to dismiss on January 11, 2010.

## **LEGAL STANDARD**

The function of a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure "is merely to assess the legal feasibility of the complaint, not to assay the weight of evidence that might be offered in support thereof." Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc., 748 F.2d 774, 779 (2d Cir. 1984) (quoting Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980)).  Therefore, when considering a motion to dismiss, the Court must accept the facts alleged in the complaint as true, draw inferences in the light most favorable to the plaintiff and construe the complaint liberally. Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001).  In ruling on a motion to dismiss, the Court may consider only "the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Although detailed allegations are not required, a claim will be found facially plausible only if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949. Conclusory allegations are not sufficient. Id. at 1949-50.

## DISCUSSION

### I. Darien Fails to Allege a Cognizable Breach of the Implied Covenant of Good Faith and Fair Dealing (Count IV)

JLRNA argues that Darien's claim for breach of the implied covenant of good faith and fair dealing should be dismissed because Darien has not sufficiently alleged the required element of bad faith. JLRNA is correct.

"A duty of good faith and fair dealing is implied in every contractual relationship and it requires that neither party do anything to injure the other's right to receive the benefits of the contract." Landry v. Spitz, 102 Conn. App. 34, 46 (Conn. App. Ct. 2007). "To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a

defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." De La Concha of Hartford, Inc. v. Aetna Life Ins. Co., 269 Conn. 424, 433 (2005) (internal quotations omitted).

The Connecticut Supreme Court has defined "bad faith" in this context as follows:

> Bad faith is defined as the opposite of good faith, generally implying a design to mislead or to deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation not prompted by an honest mistake as to one's rights or duties . . . . *[B]ad faith is not simply bad judgment or negligence*, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity . . . it contemplates a state of mind affirmatively operating with furtive design or ill will.

Buckman v. People Express, Inc., 205 Conn. 166, 171 (1987). (emphasis added; quotations omitted); accord Chapman v. Norfolk & Dedham Mut. Fire Ins. Co., 39 Conn. App. 306, 320 (Conn. App. Ct. 1995). "A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." Elm Street Builders, Inc. v.

10

Enterprise Park Condominium Ass'n, Inc., 63 Conn. App. 657, 667 (2001) (citations omitted). "Whether a party has acted in bad faith is a question of fact . . . ." Renaissance Mgmt. Co., Inc. v. Conn. Hous. Fin. Auth., 281 Conn. 227, 240 (2007).

Here, Darien alleged that JLRNA's insistence upon what it terms "excessive and onerous" facility requirements as a condition of approving Darien's relocation requests evidences a lack of good faith and frustrated any opportunity Darien had to receive the benefit of its Dealer Agreement with JLRNA. These allegations, as currently stated, do not constitute a legally cognizable claim for a breach of the implied covenant of good faith and fair dealing.

Even construing the allegations in the light most favorable to Darien fails to reveal any charges that JLRNA acted with a "dishonest purpose or moral obliquity." Specifically, Darien alleges that its presentation of evidence to JLRNA showing that its facility was oversized and unsupportable given the JLRNA projected sales volume, that the required upgrades to its Land Rover facility cost nearly as much as the initial construction of the Jaguar facility and its offer to upgrade the facility if sales volume improved, rendered JLRNA's denials actions taken in bad faith. Instead, all that these allegations demonstrate is a business dispute. That Darien thought that its Jaguar facility was oversized and that JLRNA's mandated upgrades were costly

does not mean that they were required by JLRNA in bad faith—this conclusion cannot even be inferred.  Moreover, Darien's allegation that JLRNA's refusal to enter into a triggering mechanism arrangement demonstrates JLRNA's bad faith is also conclusory.  JLRNA's refusal to accept Darien's proposal can be attributed to any number of legitimate business reasons and Darien provides nothing more than *ipse dixit* statements of bad faith.  As JLRNA correctly states in its reply in support of its motion to dismiss, "Darien's allegations must raise more than a legitimate (albeit serious) business dispute over how best to advance JLRNA's and the dealer's common interest in selling Jaguar vehicles and providing superior service to Jaguar customers."

Consequently, though the question as to whether a party acted in bad faith is a question of fact, to survive a motion to dismiss under Iqbal, a complaint must contain more concrete allegations of bad faith than are contained within Darien's Amended Complaint and the absence of such allegations requires the claim's dismissal.[3]

---

[3] Because Darien has failed to properly plead a claim of a breach of the implied covenant of good faith and fair dealing, the Court need not consider JLRNA's argument that that the claim is redundant given Darien's breach of contract claim, which is not challenged as part of JLRNA's instant motion to dismiss.

II. Darien Fails to State a Viable Claim Under Connecticut General Statutes § 42-133cc(18) (Count V)

On May 8, 2009, Connecticut General Statutes § 42-133e *et seq.*, the Franchise Act, was amended to, *inter alia*, prohibit a manufacturer or distributor from unreasonably denying a dealer's relocation request so long as the dealer complies with certain notice requirements regarding the proposed relocation. Connecticut General Statutes § 42-133cc(18).

JLRNA seeks dismissal of Darien's claim under this statute for two reasons. First, JLRNA argues that the statute does not apply retroactively to franchise agreements executed prior to the subsection's effective date, like the franchise agreement between Darien and JLRNA which was executed in May 2008. Second, JLRNA argues that even if the statute does govern the relationship between the parties, Darien's request to relocate the dealership preceded the effective date of the statute.

JLRNA's second argument fails. In paragraph 49 of the Amended Complaint, Darien alleged that it renewed its request to relocate its Jaguar dealership to JLRNA on September 28, 2009, after the effective date of § 42-133cc(18). This particularized allegation meets the pleading standard established in Iqbal. JLRNA's argument that "[o]nly an entirely new relocation proposal would trigger application of the Amendment [subsection 18 of § 42-133cc]" is without support. Moreover, JLRNA's

13

challenge to the sufficiency of the evidence that Darien reiterated its relocation request is a question of fact inappropriate to consideration on a motion to dismiss.

Because the Court concludes that, for the purposes of this ruling, Darien sufficiently alleged that it proposed a dealership relocation after § 42-133cc(18) became effective, the only remaining question is whether that subsection applies retroactively to franchise agreements in existence prior to its effective date of May 8, 2009, like the one between Darien and JLRNA.

Adopted in 1972, the Franchise Act "was enacted in order to try to equalize the distribution of power between franchisees and franchisors." Hartford Elec. Supply Co. v. Allen-Bradley Co., 250 Conn. 334, 345 (1999). "The franchise act's remedial purpose, to prevent a franchisor from unfairly exerting economic leverage over a franchisee, indicates that the statute should be read broadly in favor of the plaintiff." Id.[4]

The rules of statutory construction that govern the applicability of new legislation to preexisting agreements are well established. Connecticut General Statutes § 55-3 states:

---

[4] Darien argues that because the Franchise Act has been termed "remedial," its provisions always has retroactive applicability. This is incorrect—the Connecticut Supreme Court termed the Franchise Act "remedial" in the same opinion where it determined that an amended provision was not to be given retroactive applicability. Muha v. United Oil Co., Inc., 180 Conn. 720 (1980). Consequently, it is an error to interpret language classifying the Franchise Act as "remedial" to mean that all amendments thereto apply retroactively to pre-existing franchise agreements.

14

"No provision of the general statutes, not previously contained in the statutes of the state, which imposes any new obligation on any person or corporation, shall be construed to have a retrospective effect."  "The 'obligations' referred to in the statute are those of substantive law." Nagle v. Wood, 178 Conn. 180, 186 (1979).  Thus, the Connecticut Supreme Court has "uniformly interpreted § 55-3 as a rule of presumed legislative intent that statutes affecting substantive rights shall apply prospectively only." Darak v. Darak, 210 Conn. 462, 467 (1989); see Heffernan v. Slapin, 182 Conn. 40, 51 (1980).  "This presumption is rebutted only when the legislature 'clearly and unequivocally' expresses its intent that the legislation shall apply retrospectively." Miano v. Thorne, 218 Conn. 170, 175 (1991) (quoting State v. Lizotte, 200 Conn. 734, 741 (1986)).

It is clear that the subsection of the 2009 amendment to the Franchise Act at issue here is substantive in nature.  By imposing requirements on manufacturers and distributors in regard to their consideration of relocation requests by dealers, the legislature provided dealers with rights they did not have under this statute prior to its amendment.

The question of whether the legislature intended for this substantive amendment to apply retroactively is determined by the revised introductory portion of the subsection.  In addition to providing new substantive rights like those in subsection 18,

15

the 2009 amendment to the Franchise Act altered the introductory sentence of § 42-133cc. Prior to the amendment, the introductory sentence stated only that "[n]o manufacturer or distributor shall" perform any of a list of enumerated unlawful acts. After the amendment, the introductory sentence of § 42-133cc reads in its entirety "[n]otwithstanding the terms, provisions or conditions of any franchise agreement or other agreement between a manufacturer or distributor and a dealer, no manufacturer or distributor shall [engage in enumerated prohibited actions]."

The parties dispute whether this language indicates that the legislature intended the subsection to be retroactively applicable. Darien argues that this language evidences a clear legislative intent of retroactivity centered on the term "any." JLRNA argues that the amended introductory language is designed to ensure that the statutory language supersedes any contrary agreement of parties. Both arguments are plausible and the legislative history of the amendment is silent on the issue of retroactivity.[5] This disagreement is unsurprising; the language is ambiguous. The Fifth Circuit considered this exact language in a nearly identical case regarding an amendment to the Texas

---

[5] JLRNA points to a bill analysis discussing how the language of the introduction is designed to supersede any provision of an agreement to the contrary. While this certainly may have been *a* goal of the legislature, there is no evidence that it was the *sole* purpose of the amended introductory language.

16

franchise act regulating the relocation of dealers and explicitly held that Texas courts could decide either way on the issue of retroactivity.  Nissan Motor Corp. v. Harding, 739 F.2d 1005, 1009 (5th Cir. 1984).[6]  But see Scuncio Motors, Inc. v. Subaru of New England, Inc., 555 F. Supp. 1121, 1129 (D.R.I. 1982) (stating in dicta that the phrase "notwithstanding the terms, provisions or conditions of any agreement of franchise" implies a legislative intent for retroactivity), aff'd 715 F.2d 10 (1st Cir. 1983).

As noted, the rule in Connecticut regarding the legislative intent exception to the presumption that legislation applies prospectively only is well established—the presumption "is rebutted only when the legislature *clearly and unequivocally* expresses its intent that the legislation shall apply retrospectively."  Miano, 218 Conn. at 175 (internal quotations omitted and emphasis added).  The Fifth Circuit decision in Nissan Motor Corp. discussing that the phrase "notwithstanding any franchise agreement" was ambiguous regarding the issue of retroactivity was issued in 1984.  While it is quite clear that different courts have interpreted this language in different ways, language that was interpreted to be ambiguous 25 years ago

---

[6] The Fifth Circuit then affirmed the district court's decision to abstain from the exercise of jurisdiction based on Texas Railroad Commission v. Pullman, 312 U.S. 496 (1941), because of the ambiguity of the phrase "notwithstanding any franchise agreement" when read in the context of the broad remedial purpose of the Texas franchise act.  Nissan Motor Corp., 739 F.2d at 1009-10.

17

does not clearly and unequivocally express an intention for retroactive applicability today. Consequently, the presumption of prospective application only must be applied to the 2009 Franchise Act amendment at issue here. Moreover, retroactive application of the 2009 amendment might raise constitutional issues under the Contracts Clause. The Court is confident that if the legislature intended to subject the Franchise Act to such challenges, it would have been explicit that the 2009 amendments were meant to be applied retroactively.

Consequently, this Court is obliged to read § 42-133cc(18) as having prospective applicability only. Count V of the Amended Complaint is dismissed.

## ORDER

For the foregoing reasons, JLRNA's motion to dismiss [Doc. #31] is GRANTED. Leave to file a second amended complaint is GRANTED.

SO ORDERED

_____/s/_____
ELLEN BREE BURNS
SENIOR U.S. DISTRICT JUDGE

Dated at New Haven, Connecticut this 24th day of August, 2010.